WALLACE GREGORY v. THE STATE.

No. 3261. Decided May 16, 1906.

**1.—Murder in First Degree—Confession—Arrest—Warning—Res Gestae.**

Where upon a trial for murder the evidence showed that defendant went to a neighbor and got him to go with him for the purpose of surrendering to an officer, and that when the officer came out to him defendant handed him his pistol and said he wanted to surrender and that he had killed the deceased, such evidence was part of the res gestæ of the act of surrender and admissible.

**2.—Same—Warning—Question of Fact.**

Where upon trial for murder the testimony with reference to the warning of the defendant to introduce his admission was denied by defendant, the court should have submitted this issue to the jury.

**3.—Same—Evidence—General Reputation—Chastity.**

Upon a trial for murder where the defendant offered positive testimony to the effect that deceased had debauched the wife of defendant, but had not assailed deceased's general reputation for chastity, it was error to permit the State to introduce evidence of the general reputation for chastity of the deceased. Overruling Everett v. State, 24 S. W. Rep., 505; Martin v. State, 70 id., 973. Approving Melton v. State, 83 id., 822; McCandless v. State, 42 Texas Crim. Rep., 58; Moore v. State, 79 S. W. Rep., 565.

**4.—Same—Charge of Court—Adulterous Act—Justifiable Homicide—Statutes Construed.**

Upon a trial for murder where the evidence showed that the deceased and the wife of defendant had not actually committed adultery, and the fact that they were about to do so could only be arrived at circumstantially at the time defendant appeared upon the scene; the court should have charged under article 672, Penal Code, on justifiable homicide, that if it reasonably appeared to defendant that the parties were about to commit adultery, or had just done so, that defendant would be authorized to slay the invader of his home, and that it was not necessary to have assured himself of these facts before he could act; and it was error to charge that the jury must look to the circumstances as they might appear to a rational mind.

**5.—Same—Charge—Manslaughter—Adequate Cause—Female Relative.**

Where upon trial for murder the evidence showed that at the very time of the killing, defendant learned that his wife had previously fornicated with deceased, a charge of the court on manslaughter that insulting words or conduct on the part of the person killed towards the wife of defendant would be adequate cause, and that they could consider therewith all of the facts and circumstances in evidence, was sufficiently comprehensive.

Appeal from the District Court of Erath. Tried below before Hon. W. J. Oxford.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Riddle & Keith,* for appellant.

*J. E. Yantis,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life; hence this appeal.

The theory of the State was that deceased Gilbreath (from whom appellant rented land) was killed by appellant because of some differences between them in regard to renting lands for the succeeding year. The State proved threats by appellant against deceased. His body lay in front of appellant's house not far from a path that led by appellant's house to deceased's house. The State's theory was that deceased was passing along said path, going from a point beyond appellant's house, and that appellant on account of the grudge about said

rental contract, shot and killed him that Sunday afternoon as he passed his house. The theory of appellant was to the effect that some two or three months prior to the homicide he had suspected undue familiarity between his landlord (deceased) and his wife. That on one occasion, about a month or six weeks before, he had seen her late in the evening leaving a blacksmith shop down in the field and coming towards the house, and directly afterwards he saw deceased leave said shop and go towards his own home; that he charged her with infidelity in regard to said transaction, but she denied it; that after that he watched them. That on the Sunday evening of the homicide he left the house, telling his wife that he was going down in the field, and would likely go to a neighbor's before he got back, and it would be late before he returned: intending to watch said premises, to see if deceased came there; that he did go in the brush and watch. In a short while he saw deceased leave his house (which was situated several hundred yards from where he lived) and start in the direction of appellant's house; that he (appellant) came closer to the house, keeping under cover, and that he opened the door and discovered deceased with his arms around his wife, standing near the bed, and immediately exclaimed, "I have caught you; I am going to kill you"; and said to his wife, "This is not the first time?" and she said, "No." He then fired on deceased, the shot taking effect, and deceased immediately ran out of the house. He shot him again, and about the time he got in front of the door, deceased fell in front of the door, a few feet therefrom, and expired. His wife corroborates his statement as to the facts immediately attending the killing; and also testified that deceased and she had been unduly familiar for several months prior to the homicide; that on that Sunday evening deceased came to the house, asked where her husband was, and she told him that he had gone and would be gone some time, and he came in, and immediately began taking liberties with her person, as they were sitting down; and had about persuaded her to get on the bed, and they had just gotten up from their seats, and were standing near the bed, when appellant rushed in the room, and the firing began. This is a sufficient statement of the case to discuss the assignments.

Appellant reserved several bills of exception to the action of the court admitting statements made by defendant to others, insisting appellant was under arrest at the time and had not been properly warned. It appears that appellant went to Dublin, on the evening after the homicide, arriving there at night, for the purpose of surrendering. He went with Fred Robinson, a neighbor, from near the scene of the homicide to Dublin, going to the house of said Robinson, and there proposed to him to let him have a horse and go with him to Dublin, so that he could give up. After arriving at Dublin, he stopped at the restaurant of one Hosh. The city marshal, Trout, being sent for came to take charge of appellant, and he gave him his pistol, and said, "he wanted to surrender, that he had killed old man Gilbreath." This

statement was objected to by appellant on the ground that appellant had really surrendered to Robinson, and had certainly surrendered to Trout, and his statement to him unwarned, as shown, was not legitimate evidence against him. The court explains this by saying that appellant had not actually surrendered to Robinson, but merely at his request Robinson accompanied him to town to carry back the horse; and that appellant's statement to Trout was part of the act of surrender, and mere res gestæ and explanatory of the act, in connection with defendant's delivery of his pistol to Trout, and that said Robinson himself testified at the instance of defendant (immediately after the court overruled defendant's objection, and admitted the evidence that defendant told him at his (witness') house that he came to borrow the horse); that he had killed old man Gilbreath, and subsequently defendant and his wife both took the stand and testified that defendant killed old man Gilbreath. Of course, what occurred subsequent to the introduction of this evidence by the State, in introducing testimony to the same effect by defendant would not justify the action of the court in admitting illegal testimony. However, we are inclined to believe it was competent to admit what appellant said to Trout when he surrendered to him as a part of the res gestæ of the act of surrender. We also agree with the court, that appellant did not surrender to Robinson; that Robinson merely came with him to Dublin at his request as a companion.

In this connection we would state, in regard to the admissions or confessions of appellant to Fulkerson, which were testified to by Fulkerson and Fulkerson stated that he warned appellant before he made any statement, this warning was denied by appellant, the court should have submitted this issue to the jury.

On the trial the State introduced some twenty witnesses, who testified, over the objection of appellant, that they were acquainted with deceased during his lifetime for different periods of time, ranging from twenty to fifty years, and were well acquainted with the people who resided in the community where deceased lived at the time of his death, and where he had lived for more than fifty years; and that they were all acquainted with his reputation in the community for being a chaste and virtuous man, and that the same was good. And after being cross-examined by defendant's counsel touching their knowledge of deceased's reputation, they were permitted to testify on re-direct-examination that they had never heard deceased's reputation for chastity and virtue questioned. The bill shows that at the time this testimony was introduced defendant had rested his case, and was introduced by the State in rebuttal. That defendant based his defense upon, and offered testimony to the effect that at the time he killed deceased, he went in on deceased and caught him in a compromising attitude with his (defendant's) wife; that is with one arm around her, and the other under her clothes. The wife of defendant had testified in his behalf substantially to the same facts. She also testified that deceased had

had carnal intercourse with her three times before this occasion; and she also testified that after her husband had come in on them in the attitude above stated, and just before the shooting, her husband said, "I have caught you, this is not the first time, is it?" And to this question she answered "No," and the defendant then began to shoot deceased. Defendant did not offer any witness to prove and did not prove or offer to prove by any witness, during the whole of said trial, that the general reputation of deceased for virtue and chastity in the community where he lived, or any other place, was bad. This testimony was objected to by appellant on the ground that defendant had not put in issue the general character and reputation of deceased in the community in which he lived for virtue and chastity, and it was not permissible for the State to put in issue the character of the deceased for virtue and chastity, in the absence of an attack by defendant upon the deceased's general character in this respect; and because such testimony was prejudicial to the defendant before the jury. This question was decided in accordance with the State's contention in Everett v. State, 24 S. W. Rep., 505; Martin v. State, 70 S. W. Rep., 973. But in Moore v. State, 79 S. W. Rep., 565, the doctrine laid down in the previous case was not followed, and in Melton v. State, 83 S. W. Rep., 822, the question was discussed; and the Everett and Martin cases reviewed and overruled. We understand the doctrine now to be established, before evidence of general reputation as to some characteristic of a deceased person, can be offered by the State, this matter must first be put in issue by the defendant, by offering testimony of that reputation. It is not sufficient merely, that because of the defendant's testimony concerning the homicide, some characteristic of deceased may be brought out, or made to appear. In this case, appellant offered positive testimony to the effect that deceased had debauched the wife of appellant, which would indicate that he was not a person of good character for virtue, but this did not justify the State in order to meet this, to resort to evidence of the general reputation of deceased as to virtue and chastity. The State could not thus meet this proof by positive evidence, with proof of general reputation; and would be only authorized to introduce evidence of general reputation of the deceased in the respect offered, when appellant himself had first assailed the State's case by proof of deceased's general reputation. Graves v. State, 14 Texas Crim. App., 113; McCandless v. State, 42 Texas Crim. Rep., 58; Kennedy v. State (Ala.), 37 So. Rep., 90.

The court instructed the jury under article 672, Penal Code, to the effect that appellant would be justified if he killed deceased in the act of adultery with his wife. The court further told the jury: "By the expression 'taken in the act of adultery' as used in the last preceding paragraph of this charge, is meant, that the husband must see the parties together in such a position as indicates with reasonable certainty, *to a rational mind,* that they had just then committed the adulterous act, or were then about to commit. The law does not require the

husband to be an actual eye-witness to the act of copulation between his wife and the person slain in order to avail himself of its protection in the event he slays such person." That portion of the charge is excepted to, which addresses itself to a "rational mind." That is, it is contended it was simply the court's duty to apply the circumstances as they appeared to defendant's mind, indicating that the parties had copulated or were about to copulate; and that the use, in that connection of the expression "as indicates with reasonable certainty to a rational mind," was placing on defendant a heavier burden than the law cast upon him, and was a suggestion by the court that there might be some question of doubt as to the indications of adulterous intercourse as they presented themselves to appellant's mind at the time. We believe appellant's contention is correct. It was the indication of circumstances as they addressed themselves to appellant's mind at the time which was the question the jury were investigating, and to be told in that connection that they must look to the circumstances and as they might appear to a rational mind, while abstractly considered might be correct, yet the jury were considering how the matter appeared to appellant's mind under all the circumstances of the case.

We believe furthermore, that in a case of this character, although the parties may not be about to copulate or had not copulated, yet if the circumstances were such as to cause appellant to reasonably believe from his standpoint, that his wife and deceased had copulated, or were about to copulate, that he would be justified in acting on such appearances; and that a charge on this statute should be so framed as to present that idea. In this case the parties had not committed adultery, that they were intending to commit or about to commit adultery, can only be arrived at circumstantially. We believe in such case, if when appellant appeared upon the scene it reasonably appeared to him that the parties were about to commit adultery or had just committed adultery that he would be authorized under the statute in slaying the invader of his home, and that he would not have to assure himself that they had committed adultery or were about to commit it, before he could act.

Appellant insists that the court should have given a charge on manslaughter, predicated on the fact that at the very time of the killing, he learned that his wife had previously fornicated with deceased; that is, he asked her if it was the first time, and she said, "no." The court gave a charge on manslaughter, in which, among other things, he told the jury that insulting words or conduct on the part of the person killed towards the wife of defendant would be adequate cause; and he told the jury that they could consider in connection with manslaughter in determining the adequacy of the provocation all of the facts and circumstances in evidence in the case. It occurs to us that this was sufficiently comprehensive, and at the same time directed the attention of the jury to matters that might constitute the case one of manslaughter.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*